IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
)
THE ROCKPORT COMPANY, LLC,           )
               Plaintiff,       )
                        )    C.A. No. 04-12714 WGY
v.                        )
                        )
E. S. ORIGINALS, INC.,          )
              Defendant.    )
_____)

**<u>AFFIDAVIT OF RICHARD PATERNO</u>**

I, Richard Paterno, on oath do hereby depose and state as follows:

1.     I am the President of The Rockport Company, LLC ("Rockport") and I make this affidavit on my own personal knowledge.

2.     As President of Rockport, I was involved with the selection of E.S. Originals, Inc. ("ESO") as the licensee for the Rockport Kids brand of footwear (the "Licensed Products").  In furtherance of this selection, Rockport and ESO signed a License Agreement (the "License Agreement") for the Licensed Products.  A true and accurate copy of the License Agreement between Rockport and ESO is attached hereto as Exhibit A.

3.     As President of Rockport, I authorized the License Agreement to be executed and never intended paragraph 15 therein to be an exclusive remedy or a liquidated damages provision for a breach of obligations in the License Agreement.

4.     Rockport selected ESO to be its licensee for the Licensed Products because, among other things, it felt that ESO would produce a quality product and position the brand well due to its commitment to marketing and advertising as well as to a showroom and staffing for the Licensed Products.

5.     Although one of ESO's obligations under the License Agreement is to pay royalties, ESO's obligations to aggressively design, develop, market, manufacture, advertise, promote, merchandise, sell and service the Licensed Products under the License Agreement is, in fact, more important to Rockport than the royalties. Indeed, without these non-monetary obligations, Rockport would not have entered into the License Agreement.

6.     At some time after the License Agreement went into effect, Eddie Esses, the President of ESO, and David Helter, part of the management team at ESO's Rockport division, told me that it was not building its Rockport business as quickly as it wanted. They both assured me, however, that ESO was committed to the License Agreement and the Rockport business. Thus, I had no indication from anyone that ESO was considering pulling out of the Rockport business.

7.     In late September 2003, Mark Challant, ESO's Director of Global Sourcing, called me and said that Eddie Esses wanted to meet with me, and Mr. Esses came to my office within the next few days. At that time, Mr. Esses informed me that ESO would no longer continue the Rockport business and that ESO was shutting down its Rockport division.

8.     I was completely stunned when Eddie Esses told me this news. I never had any indication from anyone that ESO was not fully committed to pursuing the Rockport business or fulfilling its obligations under the License Agreement.

9.     Rockport immediately began searching for a new licensee because it was critical to the Rockport brand that a new licensee take over ESO's obligations to design, develop, manufacture, market, advertise, promote, merchandise, sell and service the Licensed Products.

10.     Rockport ultimately entered into a new license agreement with BBC International Ltd., but BBC was not able to have a full line of the Licensed Products in the marketplace until

the Spring 2005 season.  A copy of the License Agreement with BBC International Ltd is

attached hereto as Exhibit B.

      11.     As President of Rockport, I authorized the letter on behalf of Rockport to ESO

terminating the License Agreement.  A true and accurate copy of the letter from Rockport to

ESO dated January 12, 2004 is attached hereto as Exhibit C.

      12.     I have been informed by outside counsel that Rockport has not yet been served

with ESO's Automatic Disclosure Statement, nor have we taken any discovery.


SIGNED UNDER THE PENALTIES OF PERJURY THIS 30TH DAY OF MARCH, 2005.


               /s/Richard Paterno

               Richard Paterno

LICENSE AGREEMENT

between

THE ROCKPORT COMPANY, LLC

and

E. S. ORIGINALS, INC.

Dated as of October _16_, 2001

# TABLE OF EXHIBITS

Licensed Trademarks ................................................................. Exhibit A

Territory ........ ................................................................. Exhibit B

Licensee Accounting Statement ..................................................... Exhibit C

Guaranteed Minimum Royalties ..................................................... Exhibit D

Rockport Human Rights Standards .................................................. Exhibit E

Required Terms for Distribution Agreements ...................................... Exhibit F

Required and Approved Markings ................................................... Exhibit G

Rockport Competitors.............................................................. Exhibit H

# LICENSE AGREEMENT

THIS AGREEMENT, dated as of September __, 2001, is between The Rockport Company, LLC having its principal offices at 1895 J.W. Foster Boulevard, Canton, MA 02021 U.S.A. ("Rockport") and E. S. Originals, Inc., having its principal offices at 450 West 33rd Street, New York, NY 10001 ("Licensee").

WHEREAS, Rockport owns or has the right to use worldwide the ROCKPORT name and the ROCKPORT trademark and service mark (collectively, the "ROCKPORT Trademarks");

WHEREAS, the ROCKPORT Trademarks have acquired substantial goodwill, reputation, fame and distinctiveness throughout the world as a result of the exclusive and widespread use thereof by Rockport; and

WHEREAS, Rockport desires to grant, and Licensee desires to obtain, a limited license to use the ROCKPORT Trademarks on or in connection with certain products;

NOW THEREFORE, in consideration of the above premises and the mutual covenants and undertakings of the parties hereunder, Rockport and Licensee agree as follows:

GENERAL

1.    Term.

a.    Initial Term.  The initial term of this Agreement and the License (as defined below in Section 3) shall commence upon the date of this Agreement and shall expire on June 30, 2005, or on such earlier date as any party may terminate this Agreement in accordance with its terms (the "Initial Term").

b.    Renewal Terms.  Upon the mutual written agreement of the parties, this Agreement may be renewed for an additional three (3) year term (the "Renewal Term").  (The Initial Term and any Renewal Term are herein collectively referred to as the "Term".)

2.    Definitions.

a.    "Affiliate" shall have the meaning set forth in Regulation 12B under the Securities Exchange Act of 1934, as amended.

b.    "Confidential Information" shall mean any and all information proprietary to one of the parties hereto, whether or not reduced to writing or other tangible medium of expression, and whether or not patented, patentable, capable of trade secret protection or protected as an unpublished or published work under the United States Copyright Act of 1976, as amended [or any other applicable law].  Confidential Information includes, but is not limited to, information relating to intellectual property and to business plans, financial matters, products, services, manufacturing processes and methods, costs, sources of supply, strategic marketing plans, customer lists, sales, profits, pricing methods, personnel and business relationships.  Confidential Information shall not include any information that:  (i) was already known to the receiving party prior to its relationship with the disclosing party, as

established by written records; (ii) becomes generally available to the public other than as a result of the receiving party's breach of this Agreement; (iii) is furnished to the receiving party by a third party who is lawfully in possession of, and who lawfully conveys, such information; or (iv) is subsequently developed by the receiving party independently of the information received from the disclosing party, as established by the receiving party's written records.  For purposes of this definition, the phrase "receiving party" shall be deemed to include each Affiliate of the receiving party.

      c.    "<u>Contract Year</u>" shall mean the period July 1 of any calendar year during the Term through June 30 of each subsequent calendar year, except the first Contract Year shall begin on the date of execution of this Agreement and end on June 30, 2003, and the last Contract Year shall end on the date on which this Agreement is terminated in accordance with its terms.

      d.    "<u>Intellectual Property</u>" shall mean all trademarks, trade names, trade dress, service marks, logos, other identifying marks, copyrights, patents, trade secrets and other intellectual property.

      e.    "<u>Introduction</u>" shall mean, with respect to any Licensed Product, both: (i) exhibition of such Licensed Product at a press conference, trade show or similar event; and (ii) accepting orders for sale of such Licensed Product to customers.

      f.    "<u>Licensed Products</u>" shall mean baby, toddler and kids footwear in size 0-4, 5-10 and 11-3 respectively which bear one or more of the Licensed Trademarks and which have been approved in writing and in advance by Rockport.

      g.    "<u>Licensed Trademarks</u>" shall mean the ROCKPORT Trademarks as set forth in <u>Exhibit A</u> and any additional Trademarks which Rockport approves in advance in writing from time to time for use on and in connection with the Licensed Products.

      h.    "<u>Net Price</u>" shall mean Licensee's invoice price for net sales to its customers.  For purposes of this Agreement, "net sales" shall mean gross sales during any period less (i) quantity discounts to the extent customarily granted by Licensee on the date hereof and (ii) customer returns actually credited during the applicable period.  No deductions shall be made for:  (A) cash or other discounts (except as stated in clause (i) above); (B) commissions; (C) uncollectible accounts; (D) taxes, duties, fees, assessments, impositions, payments or expenses of any kind which may be incurred or paid by Licensee in connection with the royalty payments due to Rockport hereunder or in connection with the transfer of funds or royalties or with the conversion of any currency into United States dollars; or (E) any costs or expenses incurred, or taxes, duties, fees, assessments, impositions or payments of any kind which may be incurred or paid by Licensee, in the manufacture, offering for sale, sale, advertising, promotion, shipment, distribution or exploitation of the Licensed Products.

In the event any Licensed Products shall be sold for purposes of resale to any Affiliate of Licensee, then the Net Price thereof shall be deemed to be the Net Price at which the Affiliate sells such products to an unrelated third party.

In the event any Licensed Products (other than Licensed Products provided to Rockport pursuant to Section 20 or 21) are shipped or distributed by Licensee (or such Affiliate) and:  (i) are not billed (such as introductory offers, samples, promotions and the like); or (ii) are billed

at a price which is less than the usual Net Price for such Licensed Products in the course of Licensee's (or such Affiliate's) normal distribution, shipment and sales activities, then the Net Price thereof shall be deemed to be such usual Net Price.

i. "Person" shall mean any natural person, corporation, partnership, firm or other entity.

j. "Rockport Competitor" shall mean any Person that, directly or indirectly, competes with Rockport or any of its Affiliates.

k. "Territory" shall mean those countries and jurisdictions listed in Exhibit B hereto.

l. "Trademark" shall mean any trademark, trade name, trade dress, service mark, logo or other similar identifying mark.

## LICENSE

3. License. Subject to the terms and conditions of this Agreement, Rockport hereby grants to Licensee a limited license to use the Licensed Trademarks on Licensed Products approved in advance and in writing by Rockport during the Term for use and sale in the Territory (the "License"). Licensee shall not use the Licensed Trademarks except as expressly stated in this Agreement. All rights in and to the Licensed Trademarks not specifically granted to Licensee by this Agreement are reserved to Rockport for Rockport's own use and benefit.

4. No Trademark Sublicenses. Licensee shall not have the right to sublicense any of the Licensed Trademarks.

5. No Limitations on Rockport. Except as expressly stated in Section 3, nothing contained in this Agreement shall in any way restrict, impair, limit or affect Rockport's rights to use, or to permit third parties to use, the Licensed Trademarks.

6. Prohibited Use of Licensed Trademarks. During the Term and at all times thereafter, Licensee shall not use any of the Licensed Trademarks: (a) as a portion of, or in combination with, any other Trademarks; (b) as all or part of a corporate name, trade name or any other designation used by Licensee to identify its products, services or business; or (c) for any purpose other than as Trademarks for the Licensed Products. At no time shall Licensee use any name or Trademark in connection with the Licensed Products, which use, and the size, placement and form of which, have not been approved in writing in advance by Rockport.

7. Ownership Rights.

a. Ownership of Licensed Trademarks. Licensee acknowledges that Rockport has sole and exclusive ownership of all right, title and interest in and to the Licensed Trademarks (including, without limitation, all registrations and applications therefor). Licensee further acknowledges, represents and warrants that it has not acquired, and shall not acquire (whether by operation of law, by this Agreement or otherwise), any right, title, interest or ownership (collectively, "Ownership Rights") in or to the Licensed Trademarks or any part thereof. Should any such Ownership Rights become vested in Licensee, Licensee agrees to

3

assign, and hereby assigns. all such Ownership Rights to Rockport free of additional consideration. Licensee shall provide and execute all documents necessary, in Rockport's sole opinion, to effectuate and record each such assignment to Rockport. Licensee recognizes the value of the goodwill associated with the Licensed Trademarks and acknowledges that all rights therein belong exclusively to Rockport and further acknowledges that the Licensed Trademarks have acquired secondary meaning in the mind of the public. All use of the Licensed Trademarks and all goodwill and benefit arising from such use shall inure to the sole and exclusive benefit of Rockport. Licensee shall not, during the Term or at any time thereafter, do anything which, in Rockport's sole judgment, could in any way damage, injure or impair the validity and subsistence of the Licensed Trademarks. Licensee shall not attack, dispute or challenge Rockport's Ownership Rights in or to the Licensed Trademarks or the validity of this Agreement, nor shall Licensee assist others in so doing. All Trademarks, designs, and/or slogans appearing on or in connection with the Licensed Products shall be the sole and exclusive property of Rockport (such Trademarks, designs and/or slogans other than the ROCKPORT Trademarks shall be referred to herein as the "Additional Trademarks"). Licensee shall be solely responsible for the clearance of any Additional Trademarks, including, but not limited to, the ordering of a full clearance search, including federal, state and common law searches, from a reputable trademark search firm, a copy of which shall be provided to Rockport. Licensee agrees that all such Additional Trademarks shall be deemed a "work-



8.     Registrations and Licensing Formalities.  Licensee shall cooperate with Rockport in the execution, filing and prosecution of any trademark applications that Rockport may desire to file.  For such purpose, Licensee shall supply to Rockport, from time to time and without charge, such samples, packaging, containers, labels, tags and similar materials as Rockport may reasonably require.  Licensee shall execute and deliver to Rockport, at any time (whether during or after the Term) and without further consideration, such instruments of transfer and other documents as Rockport may reasonably request for Rockport's trademark or service mark applications or to confirm Rockport's ownership rights.  The License shall be confirmed by a separate agreement for any country within the Territory which requires same (including, without limitation, registered user agreements) or where such separate agreement is otherwise deemed appropriate by Rockport.  At Rockport's request, Licensee shall execute whatever documents or forms Rockport deems necessary to confirm the License or to record Licensee as a registered user in any country in the Territory.  The expiration or termination of this Agreement for any reason shall terminate, or act to terminate, all registered user and other license recordal documents filed or recorded pursuant hereto.  The parties expressly agree that all documents or forms filed or recorded with any trademark office or other authority relating to the License may be canceled by Rockport alone.  Licensee hereby agrees and consents to such cancellation.  If Licensee fails to execute or deliver any document or form requested or required under this Section 8 in timely fashion, Rockport may sign such document or form in Licensee's name and make appropriate disposition thereof.

9.     Alternative Marks.  If Rockport adopts an alternative to any Licensed Trademark in any country within the Territory for use on and in connection with the Licensed Products, then Rockport shall make such alternative mark available to Licensee pursuant to Section 3, and Licensee shall use such alternative mark (instead of such Licensed Trademark) in connection with the Licensed Products in such country and such alternative mark shall be deemed to be included in the definition of "Licensed Trademarks" hereunder.

10.     Infringements.  Licensee shall inform Rockport forthwith if Licensee learns of any goods or activities which infringe (or may infringe) the Licensed Products, or learns of any other infringement of the Licensed Trademarks or of any other Intellectual Property rights now or hereafter owned by RIL (U.K.) or Rockport (U.S.).  Licensee shall provide, at Licensee's expense, complete information, cooperation, and assistance to Rockport concerning each such infringement (including, without limitation, cooperation and assistance in any further investigation or legal action).  Upon learning of such infringement, Rockport shall have the right, but not the obligation, at its sole discretion and expense, to take such action as Rockport considers necessary or appropriate to enforce Rockport's rights, including, without limitation, legal action to suppress or eliminate such infringement or to settle any such dispute or action.  Rockport shall also be entitled to seek and recover all costs, expenses, and damages resulting from such infringement, including, without limitation, sums which might otherwise be due to Licensee by operation of law or otherwise, and Licensee shall have no right to share in any amounts recovered by Rockport.  Licensee shall have no authority to enforce the rights of Rockport, nor shall Licensee have any right to demand or control action by Rockport to enforce such rights.

5

ROYALTIES; CURRENCY

11.    Royalties.

a.    Royalties; Security Interest.  Licensee shall pay to Rockport a continuing royalty (i) in the First Contract Year (date of execution to June 30, 2003) and Second Contract Year (July 1, 2003 through June 30, 2004) of seven percent (7%) of the Net Price of Licensed Products sold or otherwise disposed of (excluding sales or other dispositions to Rockport under Section 20 or 21) and, thereafter, nine percent (9%) of the Net Price of Licensed Products sold or otherwise disposed of in the Territory.  Such royalties shall accrue when the Licensed Products are billed or paid for, whichever occurs earliest.  Notwithstanding the foregoing, if this Agreement or any License or any of Licensee's rights or obligations under this Agreement or such License, are assigned, transferred or delegated without Rockport's prior written consent or by virtue of operation of law (collectively, an "Unauthorized Assignment"), such royalty rate shall automatically increase to thirty percent (30%) of such Net Price, without derogation of any other rights Rockport may have with respect to such Unauthorized Assignment.

Licensee shall provide Rockport on a quarterly basis for each Contract Year included in the Term, commencing with the quarter ending December 31, 2001, a detailed written accounting of Licensed Products sold or otherwise disposed of during such quarter in the Territory, together with the amount of royalties due for such quarter to Rockport hereunder (the "Accounting").  The Accounting shall be in the form of Exhibit C.  For the second and each subsequent quarter (or partial quarter) included in the Term, the Accounting shall contain not only the required information for the most recently concluded quarter (or partial quarter), but also a "recap" covering the entire year to date.  Except as otherwise provided in Section 15, the Accounting shall be due not later than thirty (30) days after the end of each such quarter and shall be accompanied by payment to Rockport of the amount due for such quarter.

In consideration of Rockport's grant of the License hereunder, Licensee hereby grants to Rockport a security interest in and to all royalties payable and becoming payable under this Agreement.  Licensee agrees to execute and deliver to Rockport, upon Rockport's request from time to time, any instruments, documents or writings, and to do all things, necessary or reasonably requested by Rockport in order to perfect such security interest or to vest more fully in or to assure Rockport the security interest granted hereby or the royalties payable or becoming payable hereunder.   .

12.    Guaranteed Minimum Royalties.

a.    During Initial Term.  Licensee shall pay Rockport royalties on Licensed Products as set forth in Section 11 a, but in no event shall the amount of such royalties actually paid to Rockport during any Contract Year included in the Term be less than the guaranteed minimum royalty amount agreed to by the parties under this Agreement for such year (the "Guaranteed Minimum Royalties").  The Guaranteed Minimum Royalties for each such year included in the Initial Term shall be as set forth in Exhibit D hereto; provided, however, that, if any Unauthorized Assignment shall occur, such Guaranteed Minimum Royalties shall triple, without derogation of any other rights Rockport may have with respect to such Unauthorized Assignment.

6

Licensee shall pay the Guaranteed Minimum Royalties according to the payment schedule set forth in <u>Exhibit D</u>. Such Guaranteed Minimum Royalties payments shall be credited against actual royalty payments due for such year under Section 11.a.

Actual royalties paid in excess of Guaranteed Minimum Royalties which pertain to any given Contract Year included in the Term shall not accrue toward Guaranteed Minimum Royalties which pertain to any subsequent Contract Year. Annual Guaranteed Minimum Royalties under this Section 12.a shall be payable in full for each Contract Year (or partial Contract Year included in the Term and shall not be prorated or refunded with respect to any partial Contract Year remaining at the time of expiration or termination of this Agreement.

      b.    <u>During Renewal Terms</u>. Guaranteed Minimum Royalties for the Renewal Term shall be determined by mutual agreement of the parties no later than thirty (30) days before the scheduled expiration of the Initial Term. Each party agrees to negotiate in good faith to reach such mutual agreement. However, if the parties fail to reach agreement on such Guaranteed Minimum Royalties by the applicable date, then the Guaranteed Minimum Royalties for such Renewal Term shall equal the greater of: (a) 110% of the Guaranteed Minimum Royalties which accrued or were payable with respect to the immediately preceding calendar year or (b) the actual earned royalties which accrued or were payable with respect to such year. Nothing herein will be construed or interpreted as obligating either party to agree to enter into the Renewal Term.

In any event, the Guaranteed Minimum Royalties during any Renewal Term shall be subject to the treble increase described in Section 12.a in the event of any Unauthorized Assignment during such Renewal Term.

      13.    <u>Payments</u>  Unless otherwise specified in writing by Rockport, all payments by Licensee under this Agreement shall be made in United States Dollars to Rockport or to a bank or other organization designated by Rockport. Such payments shall be made by bank check, certified funds, wire transfer or corporate check (subject to collection), at the election of Rockport. When overdue, such payments shall bear interest at an annual rate of eighteen percent (18%) (or such lower rate as may then be the highest rate legally available) from the time such payment is due until payment is received by Rockport.

      14.    <u>Taxes</u>. Licensee shall withhold from any royalty payments pursuant to this Agreement any sums required to be withheld on behalf of Rockport under the applicable tax laws of the Territory. Licensee shall pay such sums to the appropriate tax authorities and shall furnish Rockport with the official tax receipt or other appropriate evidence of payment issued by such authorities.

      15.    <u>Payments upon Expiration or Termination</u>. If this Agreement expires or is terminated for any reason before all payments hereunder have been made (including Guaranteed Minimum Royalties for the Contract Year in which such expiration or termination occurs), Licensee shall immediately thereafter submit a report and pay to Rockport any remaining unpaid balance for the Contract Year in which such expiration or termination occurs, even though the due date therefor has not yet occurred, and for any prior Contract Years.

      16.    <u>Records and Right to Audit</u>. Licensee shall keep accurate records of all operations affecting royalty payments hereunder, and shall permit Rockport or its designee,

upon reasonable notice, to inspect all such records and to make copies of or extracts from such records throughout the Term and for a period of two (2) years thereafter. As part of such inspection, Rockport shall have the right to have Licensee's books of accounts and records audited, at Rockport's expense. However, if such audit reveals a payment deficiency in the amount owed to Rockport under this Agreement of five percent (5%) or more for any Contract Quarter or Year included in the Term, then Licensee shall pay all costs of such audit.

## MARKETING LICENSED PRODUCTS

17.    Timetable for Introduction. Licensee agrees that Introduction (as defined in Section 2.d) of Licensed Products shall occur in the Territory no later than the WSA Show in Las Vegas during February, 2002. Licensee shall begin actually shipping commercially reasonable quantities of such Licensed Products to customers in the Territory no later than June 15, 2002

18.    Aggressive Efforts; Marketing Expenditure.

a.    Aggressive Efforts. Licensee shall aggressively design, develop, manufacture, market, advertise, promote, merchandise, sell and service the Licensed Products in the Territory.

b.    Marketing Expenditure. Licensee shall spend no less than ten percent (10%) of its wholesale sales in the Territory on marketing for the Licensed Products. In Contract Year 1, such advertising expenditure will be at least Five Hundred Thousand Dollars ($500,000). The required marketing expenditure may include media advertising, in-store advertising, POP, fixturing, and direct mail, but shall exclude trade shows, and catalogues. Coop advertising shall count towards the required marketing expenditure, but only to the extent of Seventy-Five Thousand Dollars ($75,000) in Contract Year 1 and 1.5% of wholesale sales in the Territory in Contract Years 2 and 3. In addition, Licensee will have an obligation to expend funds on trade shows, catalogues and other marketing. Rockport may require that some portion of Licensee's required marketing expenditure be contributed to Rockport to support brand marketing.

c.    Evidence of Spending. Licensee shall provide satisfactory evidence of Licensee's fulfillment of its spending obligations for each such year under Sections 18.b.

19.    Showroom/Personnel. Licensee shall establish by February 10, 2002 and, thereafter, maintain a dedicated separate office and showroom for the Licensed Products in New York City, New York. Also, Licensee shall hire and, thereafter, maintain a separate division dedicated solely to the Licensed Product business which shall include, at a minimum, a President, a Manager of Administration/Sourcing, a Product Development Manager, a Girls Designer, a Boys Designer, a Sales Manager, a Manager of Marketing Communications and a Manager of Inventory Management. All sales shall be handled by a dedicated employee sales force. Licensee shall hire the President of such division not later than January 1, 2002 and the Sales Manager and Product Manager by March 1, 2002. All other personnel shall be hired no later than June 30, 2002.

8

20.    Complimentary; Right to Purchase.

a.    Complimentary Licensed Products for Rockport.  During each Contract Year included in the Term.  Licensee shall provide to Rockport, free of charge, a reasonable number of each model and style of the Licensed Products for Rockport's advertising and promotional purposes.

b.    Right to Purchase.  In addition to the complimentary Licensed Products provided to Rockport under Section 20.a, Rockport shall have the right to purchase, during each Contract Year included in the Term, a reasonable number of units of Licensed Products at Licensee's direct manufacturing cost therefor plus freight and duty.  Such Licensed Products may be used for Rockport's advertising and promotional purposes.  Additionally, Rockport shall have the right to purchase Licensed Products at Licensee's Net Price therefor less twenty percent (20%) for the purposes of resale in Rockport's concept stores and outlet stores.

c.    Purchases by Rockport Employees.  In addition to Rockport's purchase rights under Section 20.a and 20.b., employees of Rockport shall have the right to purchase reasonable quantities of Licensed Products at Licensee's direct manufacturing cost plus a twenty-five percent (25%) margin thereon plus freight and duty.

## QUALITY CONTROL; DISTRIBUTION

21.    Quality Control of Licensed Products.  Licensee shall assure at all times that the quality of the Licensed Products is of a standard consistent with the prestige and reputation which the Licensed Trademarks have developed heretofore in the Territory and elsewhere.  Licensee additionally shall assure at all times that the Licensed Products: (a) are sourced, manufactured, labelled, distributed, marketed, advertised, promoted and sold in accordance with all applicable laws and regulations and only by parties approved in writing by Rockport; and (b) do not infringe any patents, industrial design rights, copyrights or other Intellectual Property rights of others.  Licensee shall place and display the Licensed Trademarks on and in connection with the Licensed Products only in such form and manner as are specifically approved in writing in advance by Rockport.

Before engaging in any sourcing or manufacture of the Licensed Products, Licensee shall submit to Rockport a sample of each Licensed Product to be marketed by Licensee for Rockport's approval.  Rockport shall have fifteen (15) days after actual receipt to approve or disapprove such sample.  Rockport's failure to respond within such fifteen (15) days shall be deemed non-approval.  Such approved samples shall serve as the quality standards for the functioning and visual appearance of such Licensed Product, and Licensee shall assure that each marketed unit of such Licensed Product meets such standards.  At least once during each Contract Year included in the Term (or more often, if requested by Rockport), Licensee shall submit no less than five (5) then-current production samples of each model and style of the Licensed Products marketed under this Agreement, so that Rockport may assure itself of the maintenance of such quality standards.  Such samples shall be submitted free of charge to Rockport, and shall be delivered to Rockport no more than sixty (60) days after the start of each Contract Year included in the Term (or at such other times as may be requested by Rockport).  Such samples may be retained by Rockport free of charge and shall not be counted against Rockport's allotment of complimentary Licensed Products under Section 20.a.  Rockport shall also have the right, upon reasonable notice to Licensee, to inspect the sourcing and manufacturing plants and processes for each Licensed Product under this Agreement.

9

Additionally, Licensee shall insure that it and all of its manufacturers and subcontractors comply with Rockport's Human Rights Standards as set forth in Exhibit E attached hereto and in the Guide to the Implementation of the Reebok Human Rights Production Standards, the receipt of which Licensee hereby acknowledges.

Licensee agrees that each model of Licensed Products shall be distinguishable in design from (and not confusingly similar to) other footwear products which are then, or have been, manufactured, marketed, advertised, distributed or sold by Licensee.

22.    Quality Control of Marketing and Distribution. Licensee shall submit to Rockport for its prior approval samples of: (a) all containers, packaging, labels, tags and the like; (b) all advertising, promotional and other marketing materials; (c) all stationery, business cards and invoices; and (d) all other transaction documents and business materials using the Licensed Trademarks and intended for use on or in connection with the Licensed Products. Licensee shall submit such materials in their proposed final form to Rockport at least fifteen (15) days before the proposed publication or release of such materials. Rockport shall have fifteen (15) days after receipt to approve or disapprove such materials. Rockport's failure to respond within such fifteen (15) days shall be deemed non-approval.

Licensee shall also submit to Rockport, for its prior approval, a written marketing plan containing Licensee's proposed advertising, promotional, marketing, distribution and sales strategies and targets for the Licensed Products. The first such marketing plan shall be submitted to Rockport on a date to be designated by Rockport and shall cover the first Contract Year included in the Term. Thereafter, for each subsequent Contract Year included in the Term, Licensee shall submit a marketing plan to Rockport approximately twelve (12) months prior to the in-store date for the relevant Products and no later than November 1 (for the Spring Collection for the Calendar Year two years following) and June 1 (for the Fall Collection for the following Calendar Year) of each year included in the Term. Each such marketing plan shall also state the intended distribution channels and wholesale and retail accounts for each product category included in the Licensed Products.

If Licensee intends to retain independent sales representatives or distributors to distribute the Licensed Products in the Territory, Licensee's strategy for the retention of such independent sales representatives or distributors shall be disclosed in Licensee's written marketing plan submitted pursuant to this Article 22. Licensee shall identify such representatives or distributors to Rockport and provide Rockport with a copy of the sales representative or distribution agreement with Licensee or Licensee's standard form of agreement to be used with such sales representatives or distributors and with such additional information regarding such representatives or distributors as Rockport may reasonably request (including, without limitation, the other product lines which such sales representatives or distributors carry). Without limiting the foregoing, such sales representative or distributor agreement shall include at a minimum the terms set forth on Exhibit F hereto, as well as any other terms required by Rockport. Rockport may at any time notify Licensee that it does not approve the use of such independent sales representative or distributor and Licensee shall within thirty (30) days after such notification by Rockport cease using such independent sales representative or distributor.

Licensee shall sell the Licensed Products in the Territory only through better retail channels (i.e., Nordstroms, May Department Stores, Saks, Inc., Federated, Dillards and better independents) as approved by Rockport in writing from time to time. In no event shall

10

Licensee distribute (or permit the distribution of) any Licensed Products to any close-out dealers, brokers, mass merchandisers, discount department stores, wholesale clubs or other channels which do not specialize in the merchandising of high-quality footwear, unless Rockport has given its prior written consent to such distribution.

23.    No Resale.  Licensee shall not sell Licensed Products which it knows or has reason to know are destined for resale via the Internet or to or in any countries or other jurisdictions outside the Territory.  Licensee shall expressly communicate to its customers that resale of Licensed Products outside the Licensed Territory is prohibited and shall discontinue all direct and indirect sales of Licensed Products to any customer who violates such prohibition.

24.    Required and Other Markings.

a.    Licensed Trademarks.  Licensee shall place and display the Licensed Trademarks on and in connection with the Licensed Products only in such form and manner as are specifically approved in writing in advance by Rockport.  Without limiting the foregoing, Rockport specifically requires Licensee to cause the Licensed Trademarks to appear on, and in connection with, all Licensed Products in the form set forth in the first section of Exhibit G.

25.    Disposal of Surplus, Outmoded, Defective or Deficient Licensed Products.

a.    Once each season, the parties shall confer to consider Licensee's disposal of surplus, outmoded or defective Licensed Products.  Rockport shall have the right to approve, in advance, the manner by which and the time period within which Licensee disposes of any Licensed Products, or any other materials which relate to the Licensed Products or contain the Licensed Trademarks, which are surplus, outmoded or defective, or which Rockport determines fall below the quality standards and specifications established by Rockport.  Licensee is required to obtain such approval by Rockport before proceeding with any such disposition of Licensed Products.

b.    With respect to any inventory of Licensed Products remaining upon the expiration or termination of this Agreement (collectively, the "Remaining Inventory"), Rockport shall have the right, at Rockport's option and sole discretion, to buy all or any part of the Remaining Inventory from Licensee at Licensee's direct manufacturing cost thereof plus ten percent (10%) or at wholesale market value, whichever is lower.  With respect to any Remaining Inventory which Rockport does not purchase, Licensee shall have the right to sell-off such Remaining Inventory to third parties, provided that Licensee has fulfilled all of its financial obligations to Rockport prior to the expiration or termination of this Agreement.  The period for such sell-off (the "Sell-Off Period") shall be the two (2)-month period following the expiration or termination of this Agreement.  Licensee's proposed sell-off arrangements shall be subject to Rockport's prior written approval, shall be consistent with the reputation, prestige and goodwill of the Licensed Trademarks and shall maintain Rockport's image and reputation.

Any such sell-off shall be subject to the following conditions:  (i) the quantity of such Licensed Products in inventory on such expiration or termination date shall not be unreasonably excessive; (ii) Licensee shall furnish to Rockport, within fifteen (15) days after such expiration or termination date, a written accounting (i.e., number and description) of such Licensed Products in inventory as of such date; (iii) Licensee shall continue to pay royalties pursuant to Section 11 with respect to such sales, which royalties shall be payable within thirty (30) days following the end of the Sell-Off Period; (iv) no advanced royalties or Guaranteed Minimum Royalties shall be credited

11

against such earned royalties payable on such sales; and (v) Licensee shall not advertise such sell-off of Licensed Products.

Any Remaining Inventory which is not sold to Rockport or not sold to third parties pursuant to this Section 25, and any marketing, promotional, advertising, sales or other materials which incorporate any Licensed Trademarks or relate to the Licensed Products shall, after expiration of this Agreement or, if Licensee is entitled to a sell-off, after the expiration of the Sell-Off Period, be destroyed or, at Rockport's option, returned to Rockport free of charge, and Licensee shall make no claim against Rockport for indemnification or reimbursement with respect thereto. Any destruction of Licensed Products or other materials required under this Section 24 may, at Rockport's request, be observed or supervised by Rockport and shall be certified in writing to Rockport's satisfaction. Licensee shall use best efforts to avoid having excessive quantities of Remaining Inventory and, without limitation, shall refrain from ordering excessive quantities of parts, components and other materials for, and from manufacturing excessive quantities of, Licensed Products.

## FIRST REFUSAL RIGHTS

26.    Rockport's First Refusal Rights.

a.    Intellectual Property. If, during the Term, Licensee or any Affiliate of Licensee plans to grant any rights to any of its Trademarks, patents, copyrights or other Intellectual Property used in connection with the Licensed Products to a third party, Licensee shall first notify Rockport in writing of the material terms of such proposed grant and such third party's identity. Rockport shall have sixty (60) days after receipt of such notice to elect to acquire such rights on the terms set forth in such notice. If Rockport shall fail, within such sixty (60) day-period, to give Licensee written notice of its election to acquire such rights, Licensee or such Affiliate shall have the right to enter into an agreement with such third party on such terms set forth in such notice; provided that such entry does not violate any other provisions of this Agreement (including, without limitation, the non-competition provisions of Section 32).

If Rockport so elects to include its Licensed Trademarks, it shall have the right to require Licensee to eliminate all Trademarks (including, without limitation, any Trademarks belonging to Licensee or such Affiliate) from such products, except for the Licensed Trademarks, the use of which shall be subject to the terms and conditions of this Agreement.

If Rockport does not notify Licensee within such sixty (60) day period of its election to include its Licensed Trademark, Licensee or such Affiliate shall have the right to enter such market without Rockport; provided that such entry does not violate any other provisions of this Agreement (including, without limitation, the non-competitions provisions of Section 32).

b.    Sale of Business. During the Term, if Licensee or any Affiliate of Licensee receives an offer from a third party to sell or otherwise transfer Licensee's or such Affiliate's business or any substantial part thereof (whether in the form of a stock sale, assets sale (except for "ordinary course" inventory sales), merger, consolidation or otherwise) Licensee shall notify Rockport in writing of the material terms of such offer and the identity of such third party. Rockport shall have sixty (60) days after receipt of such notice to give Licensee written notice of its election to purchase Licensee's or such Affiliate's business (or such part thereof) on such terms of the third party offer. If Rockport shall fail within such

12

sixty (60) day period to make such election. Licensee or such Affiliate shall have the right to enter into an agreement with such third party on the terms set forth in such notice; provided that: (i) such sale or other transfer does not violate any other provisions of this Agreement (including, without limitation, the non-competition provisions of Section 32) and (ii) Rockport shall continue to have the right to terminate this Agreement pursuant to Section 35.

## WARRANTY, DISCLAIMER, INDEMNITY AND INSURANCE

27.    Warranty.

   a.    Rockport Warranty.  Rockport represents and warrants to Licensee that: (i) it is able to enter into and perform under this Agreement; (ii) it is able to license all of Rockport's rights to the Licensed Trademarks (or such alternative marks, as applicable) in the Territory for purposes of this Agreement; and (iii) it has not made, and will not make, any commitments to others inconsistent with, or in derogation, of such rights.

   b.    Licensee Warranty.  Licensee represents and warrants to Rockport that: (i) it is able to enter into and perform under this Agreement; (ii) it has the right to use the E. S. Originals, Inc. Trademark and any other Trademarks it may use on or in connection with the Licensed Products; (iii) it has not made, and will not make, any commitments inconsistent with, or in derogation of, such rights; (iv) by entering into and performing under this Agreement it is not, and shall not be in conflict with any prior obligations to third parties; (v) the Licensed Products and all associated materials are, and shall be, free from any claims of infringement of any third party's proprietary or other Intellectual Property rights (including, without limitation, trade secret, patent, copyright and Trademark rights); (vi) the Licensed Products and all associated materials are, and shall be, free from defects in design, material and workmanship and are, and shall be, safe and suitable for their intended and foreseeable uses; (vii) the Licensed Products and all associated materials are, and shall be, free from any claim of product liability; and (viii) the Licensed Products and all associated materials meet, and shall continue to meet, the requirements of all applicable statutes, rules, regulations, decrees, orders, standards and guidelines.

28.    Disclaimer.  Nothing in this Agreement shall be deemed to be a representation or warranty by Rockport that the Licensed Products or Licensed Trademarks will be free from claims of infringement of the patents, Trademarks, trade dress, copyrights or other Intellectual Property rights of any third party." Notwithstanding any other provision of this Agreement, Rockport shall have no liability whatsoever to Licensee or any other Person for, or on account of, any injury, loss or damage, of any kind or nature, sustained by, or any damage assessed or asserted against, or any other liability incurred by or imposed upon, Licensee or any other Person, arising out of or in connection with or resulting from: (a) the manufacture, use or sale of Licensed Products; (b) the use of any Confidential Information disclosed by Rockport; or (c) any marketing, advertising or promotional activities in connection with the Licensed Products (with the exception of third party trademark infringement claims arising from Licensee's use of the Licensed Trademarks in accordance with this Agreement).  Licensee shall hold Rockport, and each of its directors, officers, employees, agents and Affiliates, harmless in the event that Rockport, or any of its directors, officers, employees, agents or Affiliates, is held liable with respect thereto.

29.    Indemnity.

13

a.   Indemnification by Rockport.   Rockport shall indemnify and hold Licensee and each of its directors, officers, employees, agents and Affiliates harmless from and against any and all claims, actions, suits, proceedings, losses, damages and expenses (including, without limitation, reasonable attorneys', consultants' and experts' fees) (collectively, "Claims") arising out of or relating to any inaccuracy or breach of Rockport's representations, warranties, covenants or other obligations hereunder.

b.   Indemnification by Licensee.   Licensee shall indemnify and hold Rockport and each of its directors, officers, employees, agents and Affiliates harmless from and against any and all Claims arising out of or relating to: (i) any inaccuracy or breach of Licensee's representations, warranties, covenants or other obligations hereunder (including, without limitation, Licensee's representations and warranties set forth in Section 27.b); (ii) the sourcing, manufacturing, marketing, advertising, promotion, distribution, sale or use of any Licensed Products (including, without limitation, any (A) product liability claims, (B) claims of personal injury, death or property damage, (C) claims made under any guaranties made or warranties given (in each case, whether express or implied) with respect to such Licensed Products) or (D) any similar or other claim based on strict liability, negligence or warranty (whether express or implied); or (iii) any other use of the Licensed Trademarks by Licensee other than as expressly provided herein.

c.   Indemnification Procedures.   In the event that any Claim is made as a result of which a party or any of its directors, officers, employees, agents or Affiliates (collectively, an "Indemnified Party") may become entitled to indemnification by the other party (an "Indemnifying Party") pursuant to Section 29.a or 29.b, the Indemnifying Party shall, at its expense, have the right to participate in, and, at its option, to assume the defense of such Claim with counsel reasonably satisfactory to the Indemnified Party. Promptly upon becoming aware of such Claim, the Indemnified Party shall give the Indemnifying Party notice thereof: provided, however, that the omission so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any liability which it may have to the Indemnified Party, except to the extent that the Indemnifying Party is actually prejudiced by such omission. If the Indemnifying Party elects so to assume the defense of such Claim, following its notice of such election to the Indemnified Party, the Indemnifying Party shall not be liable to the Indemnified Party pursuant to such Section for any legal or other expenses subsequently incurred by the Indemnified Party in connection with the defense of such Claim, except to the extent otherwise provided below. Any settlement of any Claim shall require the mutual consent of the Indemnifying Party and the Indemnified Party and shall include as an unconditional term thereof the giving by the claimant or plaintiff to the Indemnified Party of a release from all liability with respect to such Claim. Notwithstanding the right of the Indemnifying Party to assume the defense of any Claim to which the Indemnified Party may become a party or target, the Indemnified Party shall have the right to employ separate counsel and to participate in the defense of such action. The Indemnifying Party shall bear the reasonable fees, costs and expenses of such separate counsel, if: (i) the use of the counsel chosen by the Indemnifying Party to represent the Indemnified Party would present such counsel with a conflict of interest; (ii) the defendants in, or targets of, such Claim include both the Indemnified Party and the Indemnifying Party and the Indemnified Party shall have reasonably concluded that there may be legal defenses available to it which are different from or additional to those available to the Indemnifying Party (in which case the Indemnifying Party shall not have the right to direct the defense of such Claim on behalf of the Indemnified Party); (iii) in the exercise of the Indemnified Party's reasonable judgment, the Indemnifying Party shall not have employed satisfactory counsel to represent the Indemnified Party within a reasonable time after notice of

14

the institution of such Claim; or (iv) the Indemnifying Party shall not have assumed the defense of such Claim.

30.   Insurance.  Licensee shall maintain commercial general liability insurance, including advertising and product liability, at its own expense, written on an occurrence form, in full force and effect, at all times during which Licensed Products are sold and for one (1) year thereafter.  Such insurance shall be written with a reputable insurer satisfactory to Rockport in an amount of not less than Five Million Dollars ($5,000,000) (the "Required Policy").  Rockport and its subsidiaries and distributors shall be named as an additional insured under the Required Policy.  Additionally, the Required Policy shall provide for at least 30 days' advance written notice of cancellation or any substantial modification thereof (including, without limitation, any reduction of the aggregate coverage limit).

Prior to the expiration of the Initial Term and of each Renewal Term, Rockport shall review the insurance requirements pursuant to this Section 30 and, if Rockport, in its good faith business judgment based upon past claims history, dollar volume of sales and current market conditions, believes that such requirements do not adequately protect Rockport and its subsidiaries and distributors, Rockport shall have the right to require, as a condition to Licensee's right to renew the Term, that Licensee increase its insurance coverage to levels which Rockport, in exercising such judgment, believes will adequately protect Rockport.

Upon execution of this Agreement, and as Rockport may request from time to time, Licensee shall provide Rockport with a certificate of insurance or copy of the policy evidencing the coverage outlined in this Section 30.  Renewal certificates for such policy shall be issued at least ten (10) days prior to the policy expiration.

## CONFIDENTIAL INFORMATION; NON-COMPETITION

31.   Confidential Information.

a.   Confidential Treatment.  The parties acknowledge that during the course of their performance under this Agreement, each party may learn Confidential Information of the other party.  Each party agrees to take reasonable steps to protect such Confidential Information and further agrees that it shall not: (a) use such Confidential Information except as required in the normal and proper course of performing under this Agreement; (b) disclose such Confidential Information to a third party; or (c) allow a third party access to such Confidential Information (except as may otherwise be required by law) without, in each case, obtaining the prior written approval of the other party, provided, however, that such restrictions shall not apply to Confidential Information which a party has requested be subject to a confidentiality order but nonetheless is required to be revealed to an adjudicating body in the course of litigation.  The foregoing restrictions shall continue to apply after the expiration or termination of this Agreement, regardless of the reason for such expiration or termination, and shall continue to apply for so long as the confidential nature of such information is maintained.  All Confidential Information is, and shall remain, the property of the party which supplied it.  Each party shall take reasonable steps to mark its Confidential Information with appropriate legends, provided, however, that the failure so to mark such Confidential Information shall not relieve the other party of its obligations hereunder.

b.   Forbidden Use of Rockport's Confidential Information.  Under no circumstances shall Licensee: (a) use Rockport Confidential Information in connection with

15

products which are not Licensed Products; or (b) disclose Rockport Confidential Information to, or allow access to Rockport Confidential Information by, anyone not associated with the research, design, development or manufacture of Licensed Products.

32.    Non-Competition; No Recruitment.

a.    Non-Competition by Licensee.  Neither Licensee nor any Affiliate of Licensee shall at any time during the Term (a) manufacture, market, source, advertise, promote, distribute or sell any footwear on behalf of or for any of Rockport Competitors identified in Exhibit H (collectively, the "Restricted Products"); (b) enter into any licensing agreements or other agreements to market, advertise, promote, distribute or sell footwear with any of the Rockport Competitors identified in Exhibit H or any other manufacturer or distributor that competes with Rockport in the "brown shoe" industry; or (c) make any other agreements with any of the Rockport Competitors identified in Exhibit H.  Notwithstanding the foregoing, the parties agree that Licensee may (i) manufacture "brown shoe" men's footwear for Sperry-Topsider and Tommy Hilfiger Footwear and (ii) manufacture children's footwear for Osh-Kosh.

The competition prohibited by this Section 32 includes, but is not limited to, any direct or indirect, sole or joint, (i) ownership, management, operation, control or investment in the securities of (except ownership of 1% or less of the equity securities of any publicly traded company), (ii) loans or advances to, (iii) employment by or consulting position, subcontract or other business relationship with, or (iv) any other connection or affiliation with, any person or entity that is engaged in, or is about to become engaged in, research and development of, or manufacturing, marketing, advertising, promoting, distributing or selling, any Restricted Product or any process or services related thereto.

b.    Non-Competition by Rockport.  During the Term, Rockport shall not use, or grant any license for the use of, in the Territory, the Licensed Trademarks on or in connection with children's footwear, except pursuant to this Agreement.  Licensee acknowledges and agrees that the foregoing prohibition shall in no way prevent or restrict Rockport or any of its Affiliates from using, or granting any license for the use of:  (i) trademarks other than the Licensed Trademarks on such types of products, either in or outside of the Territory; (ii) the Licensed Trademarks inside the Territory on products other than children's footwear; or (iii) the Licensed Trademarks outside the Territory on any products.

## TERMINATION

33.    Termination for Failure to Introduce Products.  If any Introduction of any Licensed Product pursuant to Section 17 does not occur by the agreed upon timetable therefor, Rockport shall have the right, without prejudice to any other rights it may have, at any time thereafter to terminate this Agreement, effective immediately upon giving notice to Licensee.

34.    Termination for Breach or Non-Compliance.  If Licensee breaches any of:  (a) its trademark use obligations under Section 6; (b) the limitations of the License granted herein as to the scope of Licensed Products and the Territory and the parties to whom Licensee is permitted to sell Licensed Products; (c) its insurance coverage obligations under Section 30; (d) its non-competition obligations under Section 32.a; (e) its representations and warranties under Section 27.b; (f) its obligation to obtain Rockport's written approval of any manufacturer or subcontractor under Section 21 or (g) The Rockport Human Rights Standards referenced

16

under Section 21 and Exhibit E. Rockport shall have the right, without prejudice to any other rights it may have, at any time thereafter to terminate this Agreement, effective immediately upon giving notice to Licensee.

Additionally, if either party breaches any of its other representations, warranties or obligations under this Agreement, the other party shall have the right, without prejudice to any other rights it may have, at any time thereafter to terminate this Agreement upon at least ten (10) days' notice to the breaching party in the case of a breach of a payment obligation, or upon at least thirty (30) days' notice thereto in the case of any other breach, provided that such breach is continuing at the end of the relevant notice period. Such termination shall automatically become effective unless the breaching party completely remedies such breach to the other party's reasonable satisfaction within such applicable notice period.

35.    Termination Due to Insolvency. If Licensee: (a) commences or becomes the subject of any case or proceeding under the bankruptcy, insolvency or equivalent laws of any country in the Territory; (b) has appointed for it or for any substantial part of its property a court-appointed receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official; (c) makes an assignment for the benefit of its creditors; (d) defaults on any obligation which is secured, in whole or in part, by a security interest in the Licensed Products; (e) fails generally to pay its debts as they become due; or (f) takes corporate action in furtherance of any of the foregoing (collectively, herein referred to as "Events of Insolvency"), then, in each case, Licensee shall immediately give notice of such event to Rockport. Whether or not such notice is given, Rockport shall have the right, to the fullest extent permitted under applicable law, following the occurrence of any Event of Insolvency and without prejudice to any other rights Rockport may have, at any time thereafter to terminate this Agreement and the License, effective immediately upon giving notice to Licensee.

36.    Termination upon Change of Business. If Licensee or any Affiliate of Licensee (either in a single transaction or in a series of related transactions, and either directly or indirectly): (a) sells, or otherwise disposes of, all or substantially all of its business or assets (except for "ordinary course" inventory sales); or (b) transfers effective voting or other business control of itself, then Rockport shall have the right, without prejudice to any other rights Rockport may have, at any time thereafter to terminate this Agreement, effective immediately upon giving notice to Licensee.

37.    Termination for Failure to Sell Sufficient Quantities. If Licensee shall fail to achieve at least eighty percent (80%) of the applicable minimum Net Sales of units of Licensed Products during any Contract Year, as set forth below:

| Contract Year | Minimum Net Sales |
|---|---|
| 1. (Execution to 6/30/03) | $5,000,000 |
| 2. (7/1/03 to 6/30/04) | $10,000,000 |
| 3. (7/1/04 to 6/30/05) | $15,000,000 |

Rockport shall have the right, without prejudice to any other rights it may have, at any time thereafter to terminate this Agreement, effective immediately upon giving notice to Licensee. For the purposes of this Section, Minimum Net Sales shall only include sales in the approved

17

channels of distribution. Minimum Net Sales shall not include any close-out sales. Failure to achieve Minimum Net Sales shall not excuse Licensee's obligation to pay Rockport the Minimum Guaranteed Royalties under Section 12.

The minimum Net Sales of Licensed Products for each Contract Year included in any Renewal Term shall be determined by mutual agreement of the parties no later than thirty (30) days before the scheduled expiration of the Initial Term and of the first Renewal Term (if applicable). Each party agrees to negotiate in good faith to reach such mutual agreement. However, if the parties fail to reach agreement on such number by the applicable date, then the minimum number of units for each calendar year included in such Renewal Term shall equal the greater of: (a) 110% of the minimum number of units required hereunder to be sold in the immediately preceding calendar year or (b) the actual number of units sold in such preceding year. Nothing herein shall be construed or interpreted as obligating either party to agree to enter into a Renewal Term.

38.    <u>No Rights after Term</u>. Licensee understands and acknowledges that, with the exception of its surviving rights as provided in Section 45, no rights under this Agreement whatsoever shall extend to Licensee beyond the expiration or termination of this Agreement. Licensee shall not be entitled to any compensatory payment in connection with the expiration or termination of this Agreement for any reason.

39.    <u>Automatic Expiration or Termination of License</u>. The License shall automatically expire or terminate upon the expiration or termination of this Agreement for any reason. Subject only to Section 25, upon such expiration or termination, Licensee shall immediately cease all use of the License and shall, at Rockport's request, take all steps and actions as Rockport may deem necessary to reflect or confirm such expiration or termination and surrender of Licensee's rights to use same. Licensee shall not be entitled to any compensatory payment upon such expiration, termination or surrender for any reason.

39.    <u>Return of Property</u>. Each party shall return to the other, promptly upon the expiration or termination of this Agreement, or at any other time when requested, any and all property of the other party (including, but not limited to, all Confidential Information and copies thereof); <u>provided, however</u>, that Rockport shall have the right to retain free of charge any samples supplied to it under Section 21 of this Agreement and any complimentary products supplied to it under Section 20 hereof.

## ADDITIONAL MISCELLANEOUS TERMS

40.    <u>Approvals, etc.</u> All approvals required or given pursuant to this Agreement shall be in writing. Rockport's approval of Licensed Product samples, artwork or advertising, promotional or marketing materials shall not be construed to mean that Rockport has determined that such items conform to the laws or regulations of any jurisdiction or, in the case of Licensed Product samples, that such samples are safe or fit for their intended purpose. Rockport may revoke its approval of a Licensed Product sample at any time, if the Licensed Product subsequently is determined by Rockport to be ineffective for its intended purpose, unsafe or deficient in quality. Additionally, if, following approval of any item for which approval is required under this Agreement, any significantly unfavorable publicity or claim should arise or be made in relation to such item, Rockport shall have the right to revoke its approval of such item. In the event of any revocation of Rockport's approval hereunder, Licensee shall immediately thereafter discontinue its manufacture, distribution, sale, use and

18

publication of such item. After Rockport has approved any item for which approval is required under this Agreement, Licensee shall not make any material change in or to such approved item without again obtaining Rockport's prior written approval.

In the event that Licensee shall experience any Event of Insolvency (as defined in Section 35) or in the event Rockport determines that Licensed Products sold by Licensee are defective or unsafe, Rockport shall have the right (but shall not be obligated) to require the recall of any Licensed Product which is, or may be, defective or unsafe, provided, however, that such recall (or failure so to recall) shall not relieve Licensee of its indemnification obligations pursuant to Section 29.

41.    Independence of the Parties. Neither party hereto shall be construed to be the agent of the other in any respect. The parties have entered into this Agreement as independent contractors only, and nothing herein shall be construed to place the parties in the relationship of partners, joint venturers, agency or legal representation. Neither party shall have the authority to obligate or bind the other in any manner as to any third party.

42.    Prior Obligations. Each party represents and warrants that, by entering into and performing under this Agreement, it is not in conflict with any prior obligations to third parties. Neither party shall intentionally disclose to, or use on behalf of, the other party any information which is proprietary to a third party, unless written authorization from such third party is first obtained in form and substance satisfactory to the other party.

43.    Survivorship. All rights and obligations of the parties which, by their express terms or nature, survive the expiration or termination of this Agreement shall continue until fully performed.

44.    Entire Agreement. This Agreement constitutes the entire agreement between the parties with respect to its subject matter and supersedes all prior agreements, understandings, commitments, negotiations and discussions with respect thereto, whether oral or written.

45.    Headings. Headings and subheadings in this Agreement are included solely for convenience of reference and shall not affect the interpretation of, or be considered a part of, this Agreement.

46.    Amendment. This Agreement may not be amended or modified in any respect, except in writing signed by all parties.

47.    Waiver. The failure of any party to insist upon strict adherence to any provision of this Agreement on any occasion shall not be considered a waiver of such party's right to insist upon strict adherence to such provision thereafter or to any other provision of this Agreement in any instance. Any waiver shall be in writing signed by the party against whom such waiver is sought to be enforced.

49.    Assignability; Successors and Assigns. This Agreement and the License are personal to Licensee. Licensee shall not assign or transfer any of its rights or delegate any of its obligations under this Agreement or the License, without the prior written consent of Rockport. Any attempted assignment, transfer or delegation in violation of this Section 50 or by virtue of the operation of law shall be null and void and of no effect. This Agreement shall

19

be binding upon, and shall inure to the benefit of, the parties' respective successors and permitted assigns.

For purposes of this Section 50, a "transfer" shall include, without limitation, the following actions by Licensee (whether effected in a single transaction or in a series of related transaction, and whether effected directly or indirectly): (a) the sale or other disposition of all or substantially all of Licensee's business or assets (except for "ordinary course" inventory sales); and (b) the transfer of effective voting or other business control of Licensee.

48.    Reformation; Severability.  The provisions of this Agreement shall be severable. If a court of competent jurisdiction shall declare any provision of this Agreement invalid or unenforceable, the other provisions hereof shall remain in full force and effect, and such court shall be empowered to modify, if possible, such invalid or unenforceable provision to the extent necessary to make it valid and enforceable to the maximum extent possible.

49.    Equitable Relief.  Licensee acknowledges and agrees that: (a) its failure to perform its obligations under this Agreement and its breach of any provision hereof, in any instance, shall result in immediate and irreparable damage to Rockport; (b) no adequate remedy at law exists for such damage; and (c) in the event of such failure or breach, Rockport shall be entitled to equitable relief by way of temporary, preliminary and permanent injunctions, and such other and further relief as any court of competent jurisdiction may deem just and proper, in addition to, and without prejudice to, any other relief to which Rockport may be entitled.

50.    Governing Law and Jurisdiction.  This Agreement shall be governed by and construed in accordance with the internal substantive laws of The Commonwealth of Massachusetts applicable to agreements made and to be performed entirely therein.  Licensee hereby consents to the exclusive jurisdiction of the courts of The Commonwealth of Massachusetts and of the United States District Court for the District of Massachusetts for resolution of all claims, differences and disputes which the parties may have regarding this Agreement.

51.    Delivery of Materials; Notices, etc.  Materials required to be delivered to any party hereunder shall be delivered to the address given below for such party.  Unless otherwise expressly stated in this Agreement, any notice, accounting statement, consent, approval or other communication under this Agreement shall be in writing and shall be considered given: (a) upon personal delivery or delivery by telecopier (with confirmation of receipt by receiver), (b) two (2) business days after being deposited with an "overnight" courier or "express mail" service, or (c) seven (7) business days after being mailed by registered or certified first class mail, return receipt requested, in each case addressed to the notified party at its address set forth below (or at such other address as such party may specify by notice to the others delivered in accordance with this Section 54):

If to Rockport:          The Rockport Company, LLC
                         4 West 58th Street
                         New York, New York  10019
                         Attention:  Director of Business Planning and Development
                         Fax No.:  (646) 840-5209

With a courtesy copy of correspondence (only) to:

                         The Rockport Company, LLC
                         1895 J.W. Foster Boulevard
                         Canton, Massachusetts  02021
                         Attention:  General Counsel
                         Fax No.:  (781) 401-4780

If to Licensee:          E. S. Originals, Inc.
                         450 West 33rd Street
                         New York, New York  10001
                         Attention:  Morris Shalom
                         Fax No.:  (212) 736-8366


    52.    Confidentiality of Agreement.  Except as required by order of a court or
government agency of competent jurisdiction, this Agreement and its provisions shall be
considered Confidential Information.  Rockport and Licensee shall jointly develop and agree
upon any press releases or other public statements to the media to be released upon or after
execution of this Agreement.

    53.    Authorization and Ability to Execute.  Each party represents that its undersigned
officer is duly authorized to sign this Agreement on its behalf.

21

IN WITNESS THEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers as of the date first set forth above.

THE ROCKPORT COMPANY, LLC

By: _____

Signature

SHARON A BRYAN

Typed or Printed Name

CFO

Title

E. S. ORIGINALS, INC.

By: _____

Signature

Morris Shalon

Typed or Printed Name

CEO

Title

22

**EXHIBIT A**

## LICENSED TRADEMARKS

ROCKPORT
XCS

23

# **TERRITORY**

The United States

24

EXHIBIT C

## LICENSEE ACCOUNTING STATEMENT

LICENSEE: _____

ROYALTY PERIOD: _____

SUBMITTED BY: _____

| SKU # | Account | Royalty Rate | Net Price | Units Sold | Revenues | Royalties |
|-------|---------|--------------|-----------|------------|----------|-----------|
|       |         |              |           |            |          |           |
|       |         |              |           |            |          |           |
|       |         |              |           |            |          |           |
|       |         |              |           |            |          |           |
|       |         |              |           |            |          |           |
|       |         |              |           |            |          |           |
|       |         |              |           |            |          |           |
|       |         |              |           |            |          |           |
|       |         |              |           |            |          |           |
|       |         |              |           |            |          |           |
|       |         |              |           |            |          |           |
|       |         |              |           |            |          |           |
|       |         |              |           |            |          |           |
|       |         |              |           |            |          |           |
|       |         |              |           |            |          |           |
|       |         |              |           |            |          |           |
|       |         |              |           |            |          |           |
|       |         |              |           |            |          |           |
|       |         |              |           |            |          |           |

EXHIBIT D

## GUARANTEED MINIMUM ROYALTIES

| Contract Year | Guaranteed Minimum Royalties |
|---|---|
| 1. (Execution to 6/30/03) | $350,000 |
| 2. (7/1/03 to 6/30/04) | $700,000 |
| 3. (7/1/04 to 6/30/05) | $1,350,000 |

## GUARANTEED MINIMUM ROYALTIES
### PAYMENT SCHEDULE

| Date | Amount |
|---|---|
| January 1, 2002 | $58,333.33 |
| April 1, 2002 | $58,333.33 |
| July 1, 2002 | $58,333.33 |
| October 1, 2002 | $58,333.33 |
| January 1, 2003 | $58,333.33 |
| April 1, 2003 | $58,333.33 |
| July 1, 2003 | $175,000 |
| October 1, 2003 | $175,000 |
| January 1, 2004 | $175,000 |
| April 1, 2004 | $175,000 |
| July 1, 2004 | $337,500 |
| October 1, 2004 | $337,500 |
| January 1, 2005 | $337,500 |
| April, 2005 | $337,500 |

26

AMENDMENT NO. 1 TO
LICENSE AGREEMENT

This Amendment is made as of the ___ day of December, 2001, between THE ROCKPORT COMPANY, LLC ("ROCKPORT") and E.S. ORIGINALS, INC. ("LICENSEE"). Reference is made to the License Agreement dated October 16, 2001 (the "LICENSE AGREEMENT") between ROCKPORT and LICENSEE. Terms defined in the LICENSE AGREEMENT and not otherwise defined herein are used herein as so defined.

WHEREAS, ROCKPORT and LICENSEE have entered into the LICENSE AGREEMENT whereby ROCKPORT granted LICENSEE a limited license to use ROCKPORT trademarks on or in connection with certain products upon the terms and conditions set forth therein;

WHEREAS, ROCKPORT and LICENSEE desire to amend certain terms and conditions of the LICENSE AGREEMENT subject to all other terms and conditions set forth therein;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained ROCKPORT and LICENSEE agree as follows:

1.      Amendment to LICENSE AGREEMENT.  ROCKPORT and LICENSEE agree to amend the LICENSE AGREEMENT as follows:

1.1     Section 2.f of the License Agreement is hereby amended to read in its entirety as follows:

"f.     "Licensed Products" shall mean baby, toddler and kids footwear in sizes 0-4, 5-10 and 11-5 for girls and sizes 0-4, 5-10 and 11-7 for boys, which bear one or more of the Licensed Trademarks and which have been approved in advance by Rockport."

1.2     Section 2 of the License Agreement is hereby amended by inserting the following as subsection 2.m:

"m.     "Authorized International Distributors" shall mean international distributors which (i) have entered into and have in effect a Distribution Agreement with ROCKPORT and (ii) have been authorized by ROCKPORT in writing to distribute the Licensed Products. ROCKPORT shall have the right to revoke any third party's Authorized International Distributor status at any time upon notice to LICENSEE."

1.3     Section 3 of the License Agreement is hereby amended to read in its entirety as follows:

"3.    License.

    a.    Subject to the terms and conditions of this Agreement ROCKPORT hereby grants to LICENSEE a limited license to use the Licensed Trademarks on Licensed Products approved in advance by ROCKPORT during the Term for use and sale in the Territory.

    b.    ROCKPORT further grants to LICENSEE a limited, non-exclusive license to use the Licensed Trademarks on the Licensed Products approved in advance and in writing by ROCKPORT during the Term for use and sale to Authorized International Distributors (together with the grant under Section 3.a, the "License"). Notwithstanding any other provision herein, the license granted under this Section 3.b may be terminated by ROCKPORT at any time upon written notice to LICENSEE.

    c.    LICENSEE shall not use the Licensed Trademarks except as expressly stated in this Agreement. All rights in and to the Licensed Trademarks not specifically granted to LICENSEE by this Agreement are reserved to ROCKPORT for ROCKPORT's own use and benefit."

1.4    Section 11.a is hereby amended by inserting the following language at the end of the first sentence:

"and a continuing royalty of fifteen percent (15%) of Licensee's FOB cost on Licensed Products sold to Authorized International Distributors under Section 3.b. For the purpose of this Section 11.a, "FOB" shall have the meaning defined for such term by INCOTERMS 2000."

1.5    Section 11.a is hereby further amended by inserting the following language in the first sentence of the second paragraph, after the words "in the Territory": 

"or to Authorized International Distributors."

1.6    Section 12.a is hereby amended by deleting the first sentence in its entirety and inserting in its place the following:

"LICENSEE shall pay ROCKPORT royalties on Licensed Products as set forth in Section 11.a, but in no event shall the amount of such royalties actually paid to ROCKPORT during any Contract Year included in the Term, exclusive of royalties paid on sales to Authorized International Distributors, be less than the guaranteed minimum royalty amount agreed to by the parties under

2

this Agreement for such year (the "Guaranteed Minimum Royalties").

1.7 Section 12.a is hereby further amended by inserting at the end of the second sentence of the second paragraph the following clause:

> "; provided, however, that no amount shall be credited against royalty payments due on sales to Authorized International Distributors under Section 3.b."

1.8 Section 23 is hereby amended by inserting at the end of the first sentence the following language:

> ", except to the extent such sales are to ROCKPORT's Authorized International Distributors."

1.9 Section 37 is hereby amended by inserting after the third sentence the following sentence:

> "Minimum Net Sales shall not include any sales to Authorized International Distributors under Section 3.b."

1.10 Exhibit D is hereby amended to read in its entirety as follows:

### GUARANTEED MINIMUM ROYALTIES

| Contract Year | Guaranteed Minimum Royalties |
|---|---|
| 1. (Execution to 6/30/03) | $ 350,000 |
| 2. (7/1/03 to 6/30/04) | $ 840,000 |
| 3. (7/1/04 to 6/30/05) | $1,620,000 |

### GUARANTEED MINIMUM ROYALTIES PAYMENT SCHEDULE

| Date | Amount |
|---|---|
| January 1, 2002 | $ 58,333.33 |
| April 1, 2002 | $ 58,333.33 |
| July 1, 2002 | $ 58,333.33 |
| October 1, 2002 | $ 58,333.33 |
| January 1, 2003 | $ 58,333.33 |
| April 1, 2003 | $ 58,333.33 |
| July 1, 2003 | $210,000.00 |
| October 1, 2003 | $210,000.00 |
| January 1, 2004 | $210,000.00 |
| April 1, 2004 | $210,000.00 |
| July 1, 2004 | $405,000.00 |
| October 1, 2004 | $405,000.00 |
| January 1, 2005 | $405,000.00 |
| April 1, 2005 | $405,000.00 |

3

2.     All other provisions of the License Agreement, except those specifically amended herein, remain in full force and effect in accordance with their terms.

IN WITNESS WHEREOF, each of ROCKPORT and LICENSEE have caused this agreement to be executed by a duly authorized person as of the date first above written.

THE ROCKPORT COMPANY, LLC

By: _____
Title: _____CFO_____

E.S. ORIGINALS, INC.

By: _____
Title: _____C. O. O_____

AMENDMENT NO. 2
TO
LICENSE AGREEMENT

This Amendment is made as of the 31st day of March 2003 between The Rockport Company, LLC ("Rockport") and E.S. Originals, Inc. ("Licensee"). Reference is made to the License Agreement dated October 16, 2002, as amended by Amendment No. 1 thereto dated as of December 2001 (the "License Agreement"), between Rockport and Licensee. Terms defined in the License Agreement and not otherwise defined herein are used herein as so defined.

WHEREAS, Rockport and Licensee have entered into the License Agreement, whereby Rockport granted Licensee a limited license to use Rockport trademarks on or in connection with certain products upon the terms and conditions set forth therein;

WHEREAS, Rockport and Licensee desire to amend certain terms and conditions of the License Agreement subject to all other terms and conditions set forth therein;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained Rockport and Licensee agree as follows:

1.    Amendment to Section 11.a of License Agreement.  Rockport and Licensee agree that the words "fifteen percent (15%)" in the first sentence of Section 11.a of the License Agreement are hereby amended to read in their entirety as follows: "twelve percent (12%)".

2.    Other Provisions.  All other provisions of the License Agreement, except those specifically amended hereby, remain in full force and effect in accordance with their terms.

IN WITNESS WHEREOF, each of Rockport and Licensee has caused this Amendment to be executed by a duly authorized person as of the date first above written.

THE ROCKPORT COMPANY, LLC

By: _____
Name: SHARON M. BRYAN
Title: CFO

E.S. ORIGINALS, INC.

By: _____
Name: ELLIE ESSES
Title: President

AMENDMENT NO. 3
TO
LICENSE AGREEMENT

This Amendment is made as of the 22 day of May 2003 between The Rockport Company, LLC ("Rockport") and E.S. Originals, Inc. ("Licensee"). Reference is made to the License Agreement dated October 16, 2002, as amended by Amendment No. 1 thereto dated as of December 2001 and Amendment No. 2 thereto dated as of March 31, 2003 (the "License Agreement"), between Rockport and Licensee. Terms defined in the License Agreement and not otherwise defined herein are used herein as so defined.

WHEREAS, Rockport and Licensee have entered into the License Agreement, whereby Rockport granted Licensee a limited license to use Rockport trademarks on or in connection with certain products upon the terms and conditions set forth therein;

WHEREAS, Rockport and Licensee desire to amend certain terms and conditions of the License Agreement subject to all other terms and conditions set forth therein;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained Rockport and Licensee agree as follows:

1.    Amendment to Exhibit A. Exhibit A to the License Agreement is hereby amended by adding the Trademark "ROCSPORTS" thereto as a Licensed Trademark.

2.    Amendments to Section 12.a. Section 12.a of the License Agreement is hereby amended by deleting the first sentence in its entirety and inserting in its place the following:

> "Licensee shall pay Rockport royalties on Licensed Products as set forth in Section 11.a, but in no event shall the sum of (i) the aggregate amount of such royalties actually paid to Rockport during any Contract Year included in the Term, (exclusive of royalties paid on sales to Authorized International Distributors) plus (ii) fifty percent (50%) of the aggregate amount of such royalties actually paid to Rockport during any Contract Year included in the Term on sales to Authorized International Distributors authorized by Rockport to distribute the Licensed Products in the United Kingdom, be less than the guaranteed minimum royalty amount agreed to by the parties under this Agreement for such Contract Year (the "Guaranteed Minimum Royalties").

Section 12.a of the License Agreement is further amended by deleting the proviso at the end of the second sentence of the second paragraph in its entirety.

3.    Amendment to Exhibit D. Exhibit D to the License Agreement is hereby amended to read in its entirety as follows:

## "GUARANTEED MINIMUM ROYALTIES

| Contract Year | Guaranteed Minimum Royalties |
|---|---|
| 1. (Execution to 6/30/03) | $350,000 |
| 2. (7/1/03 to 6/30/04) | $700,000 |
| 3. (7/1/04 to 6/30/05) | $1,350,000 |

## GUARANTEED MINIMUM ROYALTIES
## PAYMENT SCHEDULE

| Date | Amount |
|---|---|
| January 1, 2002 | $58,333.33 |
| April 1, 2002 | $58,333.33 |
| July 1, 2002 | $58,333.33 |
| October 1, 2002 | $58,333.33 |
| January 1, 2003 | $58,333.33 |
| April 1, 2003 | $58,333.33 |
| July 1, 2003 | $175,000 |
| October 1, 2003 | $175,000 |
| January 1, 2004 | $175,000 |
| April 1, 2004 | $175,000 |
| July 1, 2004 | $337,500 |
| October 1, 2004 | $337,500 |
| January 1, 2005 | $337,500 |
| April 1, 2005 | $337,500" |

4.    Amendment to Section 22.  Section 22 of the License Agreement is hereby amended by adding at the end of the last paragraph thereof the following two sentences:

"In no event shall Licensee distribute (or permit the distribution of) any Licensed Products bearing the ROCSPORTS Trademark (i) outside the Territory, or (ii) to any account other than J.C. Penney, Famous Footwear, Rack Room, Shoe Carnival, Shoe Show/Shoe Department, Boscov's, Bealls, Peebles, Goodies, DSW, Bob's and Kids "R" Us, unless Rockport has given its prior written consent to such distribution to such account.  In no event shall the aggregate Net Sales of all Licensed Products bearing the ROCSPORTS Trademark during any calendar quarter exceed one-third (1/3rd) of the aggregate Net Sales of all Licensed Products in the Territory during such calendar quarter."

5.    Amendment to Section 34.  Section 34 of the License Agreement is hereby amended by replacing clause (b) of the first paragraph of such Section in its entirety as follows:

"(b) the limitations of the License granted herein as to (i) the scope of Licensed Products and the Territory, (ii) the parties to whom Licensee is permitted to sell Licensed Products, and (iii) the maximum amount of Net Sales during any calendar quarter of Licensed Products bearing the ROCSPORTS Trademark as set forth in Section 22;"

6.     Amendment to Section 37.  Section 37 of the License Agreement is hereby amended by deleting the first sentence in its entirety and inserting in its place the following:

"If Licensee shall fail to achieve at least eighty percent (80%) of the applicable minimum Net Sales of units of Licensed Products during either the second or third Contract Year, as set forth below:

| Contract Year | Minimum Net Sales |
|---|---|
| 2. (7/1/03 to 6/30/04) | $10,000,000 |
| 3. (7/1/04 to 6/30/05) | $15,000,000 |

Rockport shall have the right, without prejudice to any other rights it may have, at any time thereafter to terminate this Agreement, effective immediately upon giving notice to Licensee."

7.     Other Provisions.  All other provisions of the License Agreement, except those specifically amended hereby, remain in full force and effect in accordance with their terms.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, each of Rockport and Licensee has caused this Amendment to be executed by a duly authorized person as of the date first above written.

THE ROCKPORT COMPANY, LLC

By: _____

Name: SHARON M. BRYAN

Title: CFO

E.S. ORIGINALS, INC.

By: _____

Name: _____

Title: PRESIDENT

EXHIBIT B

[Intentionally Missing]

A Motion for Leave to File this Attachment Under Seal was filed with the Court

and is awaiting a ruling by Judge Young.



**ROCKPORT** | THE ROCKPORT COMPANY · 1895 J.W. FOSTER BOULEVARD, CANTON, MA 02021 · 1.800.ROCKPORT · ROCKPORT.COM

**By Facsimile: (212) 736-8366**

January 12, 2004

E. S. Originals, Inc.
450 West 33rd Street
New York, New York  10001
Attention: Eddie Esses
Copy to:  Morris Shalom

Dear Eddie:

     Reference is made to the License Agreement dated as of October 16, 2001 (as amended, the "Agreement") between The Rockport Company, LLC ("Rockport") and E. S. Originals, Inc. ("ESO"). Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Agreement.

     Rockport hereby notifies ESO pursuant to Section 37 of the Agreement that the Agreement is hereby terminated effective as of the date hereof because ESO failed to achieve at least eighty percent (80%) of the Minimum Net Sales of Licensed Products during the Contract Year ended June 30, 2003. Rockport reminds ESO of the provisions of Section 25 of the Agreement with respect to the Sell-Off Period upon termination of the Agreement. Notwithstanding the two (2) month Sell-Off Period set forth in Section 25 of the Agreement, due to the quantity of Licensed Products in ESO's inventory and the requirement that all sell-off arrangements are subject to Rockport's prior written approval, Rockport hereby agrees to extend the Sell-Off Period until June 30, 2004, subject to all other terms and conditions applicable to the Sell-Off Period set forth in the Agreement.

     This notice pursuant to Section 37 of the Agreement is not intended to imply that ESO's failure to achieve 80% of Minimum Net Sales is the only grounds under which Rockport has the right to terminate the Agreement. Accordingly, Rockport reserves all its rights under the Agreement and otherwise.

**THE ROCKPORT COMPANY, LLC**

By:_____
Sharon Bryan
Chief Financial Officer